Dear President Taylor
¶ 0 This office has received your request for an Attorney General's Opinion asking, in effect, the following questions:
Pursuant to 74 O.S. 1991, § 121[74-121] and other statutes, theCherokee Nation and the State of Oklahoma entered into a"cross-deputization" agreement ("the Agreement") in April, 1991.That Agreement provided that boards of county commissioners orindividual law enforcement agencies, such as county sheriff'soffices, could join that Agreement. In light of such Agreement,please answer the following questions:
 1. Since April, 1991, the identity of several of the signatorysheriffs has changed. Does this change in the identity of theofficeholders require any changes to the Agreement to maintainits viability?
 2. Since April, 1991, the identity of the Principal Chief ofthe Cherokee Nation has changed. Does this change in the identityof the officeholder require any changes to the Agreement tomaintain its viability?
 3. Does the fact that the Attorney General, the Governor andthe pertinent district attorney have changed since the Agreementwas made affect the viability of the Agreement?
 4. Does the fact that current cross-deputization cards havenot been issued to law enforcement officials affect the validityof the Agreement?
 I. GENERAL NATURE OF THE LAW ENFORCEMENT AGREEMENT ENTERED INTO BY THE CHEROKEE NATION, UNITED STATES DEPARTMENT OF INTERIOR AND THE STATE OF OKLAHOMA
¶ 1 The Law Enforcement Agreement you inquire about was last amended in June, 1992 and filed with the Oklahoma Secretary of State on July 8, 1992. Though originally entered into by the Cherokee Nation, the U.S. Department of Interior and the State of Oklahoma, the Agreement, under its own terms, may be joined by other law enforcement agencies, such as city police departments and county sheriffs offices. (Agreement, Section 3.) The basic purpose of the Agreement is to establish a system of cross-deputization between the Cherokee Nation and other parties, to enhance law enforcement in both the State and the Cherokee Nation.
¶ 2 The parties joining the Law Enforcement Agreement became members of an inter-governmental association called the Cherokee Nation Law Enforcement Compact. (Agreement, Section 2.)
¶ 3 One of the Agreement's primary functions is the establishment of a cooperative law enforcement relationship between an "Applicant Agency" and a "Commissioning Agency." The Agreement defines "Agency" as "the government, department, agency or political subdivision which is a party to this Agreement." (Agreement, Section 1(A).) "Applicant Agency" is defined as "the agency requesting a commission for its peace officers," and "Commissioning Agency" is defined as "the agency conferring a commission to a peace officer of a different law enforcement agency." (Agreement, Section 1(B) and (F).)
¶ 4 The Agreement provides for a Compact Secretary, a person designated by the Cherokee Nation to provide ministerial assistance to coordinate the administration of the Agreement.Id. 1(H). Upon receiving a request from an applicant agency, the Compact Secretary or the commissioning agency is required to supply commission application forms, which must be completed and returned to the commissioning agency, which must grant or deny each application "within a reasonable period of time." (Agreement, Section 3(A).)
¶ 5 The Agreement establishes various criteria to be met by individuals before a law enforcement commission can be granted. In this way, law enforcement officers of the State or the Department of Interior, or of a local city or sheriff's office can be issued law enforcement commissions by the Cherokee Nation and conversely, law enforcement officers of the Cherokee Nation can be issued commissions by the State, the Department of Interior and various other law enforcement agencies which join the Agreement. (Agreement, Section 3.)
¶ 6 Under the Agreement, a commissioning agency is empowered, at any time, to suspend any commission for reasons solely within its discretion. Reasons for suspension include, but are not limited to: (1) termination of the peace officer, (2) conviction of the peace officer of a felony or crime involving dishonesty, or (3) physical, emotional or mental conditions which might adversely affect the peace officer's performance. (Agreement, Section 3(D).)
¶ 7 Under the Agreement, commissioned peace officers have the power:
 1. to enforce the Motor Vehicle Code of Oklahoma and the Cherokee Nation, and arrest for violations as necessary;
 2. to enforce all criminal and juvenile laws of Oklahoma and the Cherokee Nation, and arrest for violations as necessary; and
 3. to enforce all federal criminal laws applicable to Indian country including the Major Crimes Act, 18 U.S.C. § 1153.
Agreement, Section 4(A).
¶ 8 The Agreement also contains provisions dealing with custody of prisoners, liability for actions of persons provided commissions, medical services, arrest procedures, compensation for detention and incarceration, and other matters. The Agreement, however, does not contain a provision limiting its term. There is nothing in the Agreement limiting its effect to a five, ten or twenty-year term, or any like term.
 II. SUSPENSION OF OR WITHDRAWAL FROM THE LAW ENFORCEMENT AGREEMENT
¶ 9 Section 12 of the Agreement provides for suspension of or withdrawal from the Agreement as follows:
 A. If any provision of this Agreement is violated by an agency, the commissioning agency may suspend performance of their obligation under this Agreement on five (5) days oral or written notice, which suspension shall last until the commissioning agency is satisfied that the violation has been corrected and will not reoccur. Reinstatement of a commission or any provision of this Agreement may be made contingent upon satisfaction of such conditions consistent with this Agreement as the Party may specify.
 B. Any agency may withdraw from this Agreement any time by giving written notice to the Compact Secretary of such withdrawal which shall be effective thirty (30) days after the date of receipt of said notice. Upon such withdrawal, the agency shall forthwith return to the respective agency its property and commissions.
Agreement, Section 12 (emphasis added).
¶ 10 The provisions of the Law Enforcement Agreement make it clear that "agencies" who enter into the Agreement, have the power to withdraw from the Agreement. Thus, while the Agreement has no "term limit," each agency that joins the Agreement has the right to withdraw from the Agreement on thirty (30) days notice.
¶ 11 Your first three questions ask whether a change in the identity of an officer of an agency that has signed the Agreement requires a change in the Agreement to maintain the Agreement's viability. In addressing this question, we first note that the Agreement is among governmental agencies, and that no individualofficeholders are parties to the Agreement. As the concluding paragraph to the introduction of the Agreement provides:
 NOW, THEREFORE, the Cherokee Nation, the U.S. Department of Interior, the State of Oklahoma, and the affected local governments of Oklahoma and their various political subdivisions and agencies agree to the following provisions[.]
¶ 12 Additionally, as pointed out above, the Agreement defines "agency" at Section 1(A) to mean: "the government, department, agency or political subdivision which is party to this Agreement." Finally, the signatures representing approval of the Agreement are all by officers, signing in their representative capacities, representing the governmental entities they serve.
¶ 13 Because the Agreement is an agreement among governmental entities, any change in the identity of an officeholder of an agency, who may have signed the Agreement as a representative of the government agency, does not affect the Agreement's validity. The Supreme Court of Washington recognized this obvious principal of law when in Board of Directors Kennewick School District v.Black, 287 P.2d 96, 101 (Wash. 1955) in which it stated:
 We have held that a school board is a corporation representing the district, and while the personnel of its membership changes, the corporation continues unchanged. Its contracts are the contracts of the board, and not of its individual members, and they remain binding regardless of changes in personnel.
Id. (Emphasis added.)
¶ 14 Accordingly, no action need be taken to maintain the Agreement's viability when the office of a compacting governmental agency changes hands.
¶ 15 As discussed above, Section 12 of the Agreement does permit newly elected or appointed officials — if empowered to represent and bind a compacting agency — to withdraw their agency from the Agreement upon giving thirty (30) days written notice. There is, however, no automatic withdrawal from the Agreement simply because an individual officeholder of a compacting agency leaves office and another individual takes his or her place.
 III. FAILURE OF A CURRENT OFFICEHOLDER TO ISSUE NEW CROSS-DEPUTIZATION CARDS DOES NOT AFFECT VALIDITY OF THE AGREEMENT
¶ 16 As indicated above, the Agreement provides for the issuance of law enforcement commissions by one agency to law enforcement officers of another agency to the Agreement, who meet the qualifications set forth in the Agreement. At Section 3(D), the Agreement provides that a commissioning agency may "at any time, suspend any commission for reasons solely within its discretion." Under this provision, the commissioning agency must notify the applicant agency in writing of the reasons for suspension of the commission. Then, within ten working days, the applicant agency must cause "the commission to be returned to the commissioning agency, unless otherwise directed by the commissioning agency." Id. Further, Section 15 of the Agreement provides that each commissioning agency "shall provide to the commissioned peace officer, sufficient commission cards, uniform patches, and commission decals for police car units which reflect the commission of the agency." Under the same section, the applicant agency shall require its peace officers "to possess the commission card while on duty, and may allow the peace office to wear the commission patch, and to place the commission decal on peace officer vehicles." While under the terms of the Agreement, the commissioning agency is required to issue identification cards when a commission is initially issued, there is no requirement that new cards be issued every time the head or principle of a commissioning agency leaves office and is replaced.
¶ 17 It is, therefore, the official Opinion of the AttorneyGeneral that:
 Under the terms of the Law Enforcement Agreement entered intobetween and among the Cherokee Nation, the United States ofAmerica, the Department of Interior, and the State of Oklahoma inApril, 1991, as later amended on May 13, 1991, January 29, 1992,April 21, 1992, and June 8, 1992, and filed in the OklahomaSecretary of State's office on July 8, 1992, the change in theidentity of tribal, federal, State, or State subdivisionofficers, does not change the validity of the Agreement, nor issuch Agreement affected by failure of a commissioning agency toissue new cross-deputization cards when the head or principle ofa commissioning agency is replaced. The Law Enforcement Agreementis an agreement of the government entities that become parties tothe Agreement, and is not an agreement among individuals;accordingly, the Agreement remains binding and enforceableregardless of changes in individual principle officeholders.
W.A. DREW EDMONDSON ATTORNEY GENERAL OF OKLAHOMA
NEAL LEADER SENIOR ASSISTANT ATTORNEY GENERAL